IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>JOSEPH D. MONIZ,<br><br>                Defendant. | 8:16CR182<br><br>**MEMORANDUM AND ORDER** |

      This matter is before the Court on defendant Joseph Moniz's ("Moniz") Objection (Filing No. 39) to Magistrate Judge Thalken's Findings and Recommendation and Order ("F&R") (Filing No. 33) on his Motion to Suppress (Filing No. 25). Moniz has been charged with aggravated sexual abuse in violation of 18 U.S.C. §§ 2241 and 1153. He seeks suppression of statements he made to Omaha Nation Law Enforcement Detention Facility Corrections Officer William Simmons ("C.O. Simmons") and to Federal Bureau of Investigation ("FBI") Agent Jeff Howard ("Agent Howard") on May 4, 2016. The magistrate judge recommends that the motion be granted in part and denied in part.

**I.    BACKGROUND**

      In his Motion to Suppress, Moniz argues that he was subjected to custodial interrogations without having been advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). The government concedes Moniz was in custody at the time the statements were made, but argues there has been no *Miranda* violation because the questioning was not an interrogation.

      On September 6, 2016, Magistrate Judge Thalken held an evidentiary hearing. Agent Howard and C.O. Simmons testified at the hearing. An audiotape recording of the defendant's conversation with Agent Howard and a videotape of his conversation with C.O. Simmons, as well as transcripts of those encounters, were offered and received in evidence. Also received in evidence were the Omaha Nation Correction Facility Shift

Log ("Shift Log") and an Omaha Nation Law Enforcement Incident Narrative ("Incident Report").

### A. Statements to C.O. Simmons

The evidence adduced at the hearing shows that Moniz turned himself in to the Omaha Nation Law Enforcement Detention Facility in Macy, Nebraska ("Macy Jail") on May 4, 2016. Moniz had already been booked into the Macy Jail when C.O. Simmons arrived for his shift at 4:00 p.m. that day. C.O. Simmons testified that he was familiar with the defendant because Moniz was a "frequent flyer," that is, Moniz "comes in and out [of the jail] from time to time." C.O. Simmons testified he had received training through the Nebraska State Corrections Facility in Grand Island but had not received any training or education on providing *Miranda* warnings to individuals.

> The magistrate judge made the following findings:
>
> Corrections Officer Simmons was notified by Mr. Moniz that he needed medical attention as reflected in Government Exhibit 1 [Shift Log]. Corrections Officer Simmons went back to the cell block and talked to Mr. Moniz and asked him what happened -- what was wrong with his arm, and Mr. Moniz made some statements to Corrections Officer Simmons with regards to that his arm got slammed in a door, or however he described it.

C.O. Simmons stated that it is jail policy (1) to call an Emergency Medical Technician ("EMT") when an inmate asks for medical attention and (2) let the EMTs ask medically-related questions and provide appropriate treatment. C.O. Simmons testified he escorted Moniz to an office area at the front of the correctional facility where EMTs began to treat Moniz.

C.O. Simmons testified he recorded the encounter with the EMTs with a video-recording device for "medical clearance" purposes—in case of false accusations by an inmate. Most of the conversation that followed is reflected in Exhibits 102 and 102A. C.O. Simmons testified, however, that before the camera was turned on, Moniz asked Simmons what charges had been filed against him. C.O. Simmons told Moniz that there

2

were two charges at the time, false imprisonment and something "domestic related." C.O. Simmons also testified that the defendant "started making statements about his arm getting slammed" in a door.

The magistrate judge found that the defendant was in custody as of the time "he turned himself in to the correctional facility" and that "any interrogation of the Defendant after that time should have been preceded by an advice of rights form under *Miranda*." He further found that during the time Moniz was at the front of the jail and an EMT was present and providing medical care to the defendant, "the questions put to Mr. Moniz by Corrections Officer Simmons constitute[d] interrogation . . . and the defendant was entitled to a *Miranda* warning before he responded to those questions." He found the questions "were not for the purposes of medical attention" and "those matters were being attended by the EMT." Accordingly, the magistrate judge concluded "[t]he statements made by the Defendant as reflected in [Ex.] 102A are, I believe, not admissible to the case in chief against the Defendant in this case."

However, the magistrate judge decided the questions "that Corrections Officer Simmons directed to the Defendant when he was in the jail cell and brought—and being brought to the front area were for the purposes of determining his medical condition and were not interrogation." Moniz objects to the magistrate judge's finding that C.O. Simmons' questions to the defendant before the EMT arrived did not constitute interrogation for the purposes of *Miranda*.

      B.      **Statements to FBI Agent Howard**

Agent Howard testified he interviewed Moniz later that evening. He stated he had been called by Omaha Nation Law Enforcement Services Officer Will Webster regarding a sexual assault. He stated he read the Incident Report before he spoke to the defendant. From the report, he stated he was aware that "Joe Moniz had allegedly raped a girl by the name of [S.K.] at an abandoned house in Walthill, Nebraska, and that there were a couple of witnesses next door who had seen Joe Moniz at the scene." The Incident Report

3

related that the victim had been treated for a broken nose and other injuries. Agent Howard acknowledged that Moniz was in custody and also testified that it is FBI policy to record interviews with suspects who are in custody. He also testified he had received training on advising suspects of their rights.

Agent Howard testified he interviewed Moniz in a small interview room in the Macy jail. After Moniz was brought to the room, Agent Howard stated he turned on the recorder, introduced himself, and, before reading Moniz his rights, "asked [the defendant] what happened to his arm because he had an ice pack on it." Agent Howard stated that it had not occurred to him that the injury to the defendant's arm could be related to the offense under investigation.

The magistrate judge found "that the initial questions put to Mr. Moniz in this case concerning what happened to his arm would be admissible as not being interrogation in the matter." He found that Moniz effectively invoked his right to remain silent after he was advised of his rights and concluded that the responses to all the questions posed after the defendant was advised of his rights should be suppressed. The defendant objects to the magistrate judge's finding that the initial questions posed by Agent Howard to the Defendant concerning his arm did not constitute interrogation for the purposes of Miranda.

## II.   LAW

When a party objects to an F&R in a criminal case, the Court is required to "make a de novo review determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (quoting 28 U.S.C. § 636(b)(1)). In *Miranda*, the Supreme Court held that, to protect an individual's Fifth Amendment privilege against self-incrimination, a custodial interrogation must be preceded by warnings of an individual's right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel. *Id.* at 478-79. "The rule under *Miranda*

4

prevents the government from using statements 'stemming from custodial interrogation of the defendant,' unless the government has used 'procedural safeguards effective to secure the privilege against self-incrimination.'" *United States v. Laurita*, 821 F.3d 1020, 1023 (8th Cir. 2016) (quoting *Miranda*, 384 U.S. at 444).

Miranda rights are triggered only when a defendant is being interrogated in police custody. *United States v. Swift*, 623 F.3d 618, 622 (8th Cir. 2010). "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014) (quoting *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir. 1997)). An officer's response to a defendant's question does not amount to an interrogation. *Id.*

"'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). The *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. *Id.* at 300-01. The definition of interrogation extends "only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 301-02 (noting "the police surely cannot be held accountable for the unforeseeable results of their words or actions"); *see United States v. Orr*, 636 F.3d 944, 954 (8th Cir. 2011). The latter portion of this definition focuses primarily on the perceptions of the suspect, rather than the intent of the police. *Id.* at 301. However, "this is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." *Id.* at 301 n.7.

It is well established that *Miranda* does not apply to biographical data necessary to complete booking or pretrial services. *United States v. Horton*, 873 F.2d 180, 181 n.2 (8th Cir. 1989); *see also Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990) (plurality

opinion) (stating that "[o]fficers do not violate *Miranda* by asking a routine booking question"). Questions normally attendant to arrest and custody fall outside the scope of *Miranda* because "[r]outine questions about a suspect's identity . . . [are] ordinarily innocent of any investigative purpose [and] do not pose the dangers *Miranda* was designed to check." *United States v. Gotchis*, 803 F.2d 74, 79 (2d Cir. 1986). These background questions can include questions about the arrestee's identity, date of birth, address, telephone number, employment status, family and marital status. *Id.* at 78-79; *see also United States v. Rodriguez*, 356 F.3d 254, 259 n. 2 (2d Cir. 2004) (explaining "[r]outine booking questions are those designed to elicit an arrestee's pedigree, such as the arrestee's name, aliases, date of birth, address, place of employment, and marital status"). Further, questions regarding an inmate's medical condition can be "part of the booking procedure designed to fulfill the government's obligation to provide medical attention if necessary." *United States v. Bishop*, 66 F.3d 569, 572 n. 2 (3d Cir. 1995).

### III. DISCUSSION

The Court has reviewed the hearing transcript and exhibits, including the audiotape and videotapes of the interviews. The Court agrees with Magistrate Judge Thalken's assessment that all of the statements memorialized in the videotaped interview of the defendant by C.O. Simmons should be suppressed. The government does not challenge that recommendation.

The Court also agrees with the magistrate judge's finding that whatever conversation C.O. Simmons and Moniz had at the cell and on their way to meet the EMT was not an interrogation. C.O. Simmons testified that Moniz requested medical assistance for his arm, asked Simmons what the charges were, and started making statements about his arm getting slammed in a door. The record shows the defendant initiated the conversation about what charges had been filed against him and asking an inmate how he hurt his arm—in the context of an inmate's request for medical treatment—is the sort of routine question that falls outside *Miranda* as attendant to the

care and custody of the defendant. Accordingly, the Court will adopt the recommendation that the Motion to Suppress be denied with respect to those statements.

With respect to the FBI interview, the Court agrees with the magistrate judge's recommendation to grant the Motion to Suppress with respect to the statements the defendant made after the *Miranda* warning. The record supports the finding that the defendant clearly invoked his right to remain silent. Immediately after being read his rights, Moniz stated unequivocally that he needed a lawyer and refused to sign a statement indicating that he was willing to talk to Agent Howard without a lawyer present.

The Court respectfully disagrees, however, with the magistrate judge's conclusion that the questions that preceded the *Miranda* warning "would be admissible as not being interrogation in the matter." Agent Howard testified that it did not occur to him that the question, "What happened to your arm?," was likely to elicit an incriminating response. Although the Court credits that testimony, the test is not the officer's subjective intent or belief, but whether an officer should know that the question would be likely to elicit an incriminating response from a suspect.

The Court finds that given Agent Howard's awareness of the facts contained in the incident report, Agent Howard should have known his question about Moniz's injury would elicit an incriminating response. He was aware that there had been a violent altercation or episode involving the victim and suspect. The initial questions were not routine booking or background questions, nor can they be said to have been interposed for any purpose related to medical care. Under the circumstances, the initial questions were not merely conversational.

The Court finds the questions that preceded the *Miranda* warning amounted to an interrogation. Accordingly, the Court will not adopt the magistrate judge's recommendation to deny the defendant's Motion to Suppress with respect to Agent

7

Howard's initial questions. The Court finds Moniz's Motion to Suppress should be granted with respect to the entire recorded conversation with Agent Howard.

IT IS ORDERED:

1. Defendant Joseph Moniz's Objection (Filing No. 39) to the magistrate judge's Findings and Recommendation and Order is SUSTAINED in part and OVERRULED in part as set forth herein.

2. The magistrate judge's Findings and Recommendation and Order (Filing No. 33) is ACCEPTED in part and REJECTED in part as set forth in this order.

3. Defendant Joseph Moniz's Motion to Suppress (Filing No. 25) is GRANTED in part and DENIED in part as set forth in this order.

Dated this 2nd day of November, 2016.

BY THE COURT:

s/ *Robert F. Rossiter, Jr.*
United States District Judge